1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   SAMUEL F.,[1]                  ) Case No. CV 17-7068-JPR
                                   )
12                   Plaintiff,    )
                                   ) **MEMORANDUM DECISION AND ORDER**
13           v.                    ) **AFFIRMING COMMISSIONER**
                                   )
14   NANCY A. BERRYHILL, Acting    )
     Commissioner of Social        )
15   Security,                     )
                                   )
16                   Defendant.    )
     _____)

17

18   **I.    PROCEEDINGS**

19        Plaintiff seeks review of the Commissioner's final decision

20   denying his applications for Social Security disability insurance

21   benefits ("DIB") and supplemental security income ("SSI").   The

22   parties consented to the jurisdiction of the undersigned under 28

23   U.S.C. § 636(c).   The matter is before the Court on the parties'

24   Joint Stipulation, filed July 17, 2018, which the Court has taken

25

26   _____

27        [1] Plaintiff's name is partially redacted in compliance with
     Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
     recommendation of the Committee on Court Administration and Case
28   Management of the Judicial Conference of the United States.

                                    1

under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

## II.  **BACKGROUND**

Plaintiff was born in 1958.  (Administrative Record ("AR") 46.)  He completed high school (AR 31) and has worked in construction and as a cart pusher (AR 159, 168).[2]

On October 23, 2013, Plaintiff applied for DIB, alleging that he had been unable to work since December 31, 2011, because of "carpal tunnel on both hands," "diabetes," "ACL on right knee," "asthma," "arthritis on left knee," "cataract," "high blood pressure," "headaches," and "back pains."  (AR 46; see also AR 158.)  On October 31 or November 1, 2013, he applied for SSI, alleging the same.  (AR 55, 135.)  After these applications were denied (AR 64, 69), he requested a hearing before an Administrative Law Judge (AR 76).  A hearing was held on April 18, 2016, at which he was represented by counsel and testified.  (AR 28-40.)  A vocational expert also testified.  (AR 40-42.)

In a written decision issued May 12, 2016, the ALJ found Plaintiff not disabled.  (See AR 10-21.)  Plaintiff requested review from the Appeals Council (AR 126-27), which denied it on July 27, 2017 (AR 1-6).  This action followed.

## III. **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and

---

[2]   The vocational expert categorized Plaintiff's work as a cart pusher as "DOT title Store laborer."  (AR 41.)  See DOT 922.687-058, 1991 WL 688132 (Jan. 1, 2016) ("Laborer, Stores").

supported by substantial evidence based on the record as a whole.
See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.
Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence
means such evidence as a reasonable person might accept as
adequate to support a conclusion. Richardson, 402 U.S. at 401;
Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It
is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1998). "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months. 42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.  The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled. 20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,

3

828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first
step, the Commissioner must determine whether the claimant is
currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.
§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine
whether the claimant has a "severe" impairment or combination of
impairments significantly limiting his ability to do basic work
activities; if not, the claimant is not disabled and his claim
must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments set
forth at 20 C.F.R. part 404, subpart P, appendix 1; if so,
disability is conclusively presumed. §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments
does not meet or equal an impairment in the Listing, the fourth
step requires the Commissioner to determine whether the claimant
has sufficient residual functional capacity ("RFC")[3] to perform
his past work; if so, he is not disabled and the claim must be

---

[3] RFC is what a claimant can do despite existing exertional
and nonexertional limitations. §§ 404.1545, 416.945; see Cooper
v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The
Commissioner assesses the claimant's RFC between steps three and
four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017)
(citing § 416.920(a)(4)).

denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, December 31, 2011. (AR 12.)[4] At step two, he concluded that

---

[4] The record has discrepancies with respect to Plaintiff's last period of employment. He testified that he last worked in 2013, in construction, which is after the alleged onset date of December 31, 2011, and that he stopped working only because he "got hurt . . . [k]ind of sort of" on the job. (AR 29.) He also testified that he left a job at Wal-Mart in 2013 and seemed to indicate that he got "laid off" around the same time from a job with an insulation company. (AR 30.) Throughout the AR, Plaintiff reported that he did construction work in scaffold building from 1999 to 2003 and worked as a cart pusher from 1992-2011. (<u>See, e.g.</u>, AR 62, 159, 168.) In his work-history report, dated December 2013, Plaintiff indicated on the first page that he had had only the two aforementioned jobs (AR 168) but then included details of two additional construction jobs (AR 171-72) without disclosing when he worked at those jobs. The disability-field-office interviewer noted in 2013 that the onset date for SSI might be October 31, 2013, noting "date last worked" as the reason why. (AR 153-54.) This issue does not appear to have
(continued...)

5

Plaintiff had severe impairments of "musculoskeletal sprains and strains and mild degenerative changes of the bilateral knees." (Id.)  He specifically found Plaintiff's impairments of "history of carpal tunnel syndrome, diabetes mellitus, headaches, asthma, sick [sic] cell thalassemia disease, anemia, plantar fascial fibromatosis, and gastritis" to be "medically determinable" but "not severe" and explained his reasoning.  (AR 12-13.)  At step three, he determined that Plaintiff's impairments did not meet or equal a listing.  (AR 15.)  At step four, he found that Plaintiff had the RFC to perform "the full range of medium work"[5] (AR 16) and could perform his past relevant work as a "stores laborer" as generally, but not actually, performed (AR 20).  Accordingly, he found him not disabled.  (AR 21.)

---

[4] (...continued)
been raised again.  The ALJ noted that Plaintiff testified to working until 2013 (AR 16) but either did not consider the work to be substantial gainful activity (notably, Plaintiff did not report any income after 2011 (AR 146)) or just overlooked the discrepancy in dates.

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  §§ 404.1567; 416.967; see also SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983) ("A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.").

**V.    DISCUSSION**[6]

Plaintiff claims that the ALJ erred in rejecting his testimony concerning his "pain, symptom [sic] and limitation." (J. Stip. at 4; see also generally id. at 4-11.)  But as discussed below, the ALJ did not err and remand is not warranted.

A.    Applicable Law

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16,

---

[6] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings.  (See AR 47-77, 181; J. Stip. at 4-11, 19-20); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also generally Davidson v. Comm'r of Soc. Sec., No. 2:16-cv-00102, 2018 WL 4680327 (M.D. Tenn. Sept. 28, 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings).

2016).[7] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original), <u>superseded in part by statute on other grounds</u>, 20 C.F.R. §§ 404.1529, 416.929.

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among

---

[7] The Ninth Circuit has clarified that SSR 16-3p, which went into effect shortly before the ALJ issued his decision,

> makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to "evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.

Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

8

other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at 959.

B. <u>Relevant Background</u>

1. <u>Treatment records</u>

Plaintiff sought treatment at St. John's Well Child and Family Center in Compton from 2012 to 2016 and saw a variety of doctors for regular blood work, follow-up appointments, and medication refills. (<u>See generally</u> AR 251-340, 361-557.) He had had a carpal-tunnel release at some point. (<u>See</u> AR 283 (noting in 2013 that he had carpal-tunnel release "4-5 years ago"), 304, 312, 444 (noting that release occurred in 1980s), 336 (noting that patient was "not sure" and release was in "1980s or 1990s"), 342 (noting in 2015 that Plaintiff had surgery for carpal-tunnel syndrome "approximately 10 years ago").) He also apparently had had surgery on his right ACL[8] in the 1980s. (<u>See</u> AR 304, 312,

---

[8] ACL surgery replaces a torn anterior cruciate ligament, one of the major ligaments in the knee. <u>See</u> <u>ACL Reconstruction</u>,
(continued...)

444; see also AR 550 (x-ray revealed right knee to be "[p]ost-surgical status").)  The record lacks contemporaneous documentation of any surgeries.

On December 10, 2012, Plaintiff saw a nurse practitioner for lab results and "sharp" back pain.  (AR 307.)  He rated his pain as an "8" of 10 in intensity but reported that he was exercising seven times a week, including "walk[ing] and weights."  (Id.) The nurse practitioner noted that he appeared to be "in no acute distress" and found "no deformity or scoliosis . . . of [his] thoracic or lumbar spine."  (AR 308.)  Despite the lack of objective findings, she assessed his back pain as "deteriorated" and prescribed him tramadol[9] and aspirin.  (Id.)  In March 2013, Plaintiff went to St. John's for a medication refill.  (AR 296.) He stated that he was in pain from "aching" in his head, at an intensity of "3."  (Id.)  He reported that he used to be a smoker but quit in 2009[10] and that he exercised seven times a week,

---

[8] (...continued)
Mayo Clinic, https://www.mayoclinic.org/tests-procedures/
acl-reconstruction/about/pac-20384598 (last visited Nov. 14,
2018).  The surgery is an outpatient procedure performed through
small incisions around the knee joint.  Id.  A successful surgery
combined with proper rehabilitation should restore full
functionality.  Id.

[9] Tramadol is similar to opioid analgesics; it helps relieve
moderate to moderately severe pain.  See Tramadol, WebMD,
https://www.webmd.com/drugs/2/drug-4398-5239/tramadol-oral/
tramadol-oral/details (last visited Nov. 14, 2018).

[10] Some treatment notes state that Plaintiff was never a
smoker (see, e.g., AR 282, 287), others that he quit smoking in
2004 (see, e.g., AR 367, 372), and some that he was a "current
someday smoker" who had quit for some period of time beginning in
2004 (see, e.g., AR 443, 448).

1 including "walk[ing] and weights." (Id.)

2 On August 2, 2013, two months before filing for DIB and SSI,

3 Plaintiff went to St. John's for back and chest pain and saw Dr.

4 Mesfin Seyoum;[11] he is listed in treatment notes from August 2013

5 until March 2014 as Plaintiff's "primary provider" (see, e.g., AR

6 292, 304, 311), although this appears to be the only time

7 Plaintiff saw him[12] (AR 282-85). Plaintiff stated that he

8 exercised five times a week. (AR 282.) Dr. Seyoum noted that he

9 appeared "well developed, well nourished, [and] in no acute

10 distress," with "no clubbing, cyanosis, edema, or deformity" and

11 with "normal full range of motion of all joints" and "normal

12 sensation, reflexes, coordination, muscle strength[,] and tone."

13 (AR 283.) He also noted that Plaintiff had "normal attention

14 span and concentration" and exhibited a "[n]ormal heel-to-toe

15 gait pattern bilaterally." (AR 284.) The only abnormality was

16 some tenderness at L5-S1 during the spine-palpation exam. (Id.)

17 He prescribed lisinopril,[13] lovastatin,[14] tramadol, and aspirin.

---

19 [11] Dr. Seyoum's medical specialty is not stated in the
20 record.

21 [12] Starting in March 2014, a nurse practitioner was listed
as Plaintiff's primary provider, although the record shows that
22 he saw her only once as well, on March 14, 2014. (AR 453-58.)

23 [13] Lisinopril belongs to a class of drugs known as "ACE
Inhibitors" and works by relaxing blood vessels so that blood can
24 flow more easily. See Lisinopril, WebMD, https://www.webmd.com/
drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details
25 (last visited Nov. 14, 2018). It treats high blood pressure.
26 (Id.)

27 [14] Lovastatin is used with proper diet to manage high
cholesterol. See Lovastatin Tablet, Extended Release 24 Hr,
28 (continued...)

11

(Id.)

A few days later, on August 6, 2013, a doctor (her name is not legible, but her first name appears to be Susan (see AR 330)) from St. John's filled out a "Referral for Physical Health Disability Assessment Services" form, noting that Plaintiff "did not bring any past records regarding the reasons he says he is not able to work." (AR 328.) She nonetheless found that he could not do the work he did before (id.) (she apparently believed he had done only construction work previously (see AR 326)) but was "able to work" (AR 329) as long as there was "no prolonged standing, no stooping or crawling[, and] no hyperextension [of] knee" involved (id.). The form explained what SSI was, and the doctor checked a box stating that Plaintiff should not apply for it (id.) and observed that he did not have a "severe" medical condition (AR 328).

On August 16, 2013, Plaintiff saw Dr. Antuan Kiley[15] for headaches and left-knee pain. (AR 291.) He ranked his left-knee pain at an "8" (presumably of 10) and said it was an "aching" kind of pain. (Id.) Nevertheless, he exercised five times a week, including "walk[ing] and weights." (Id.) Dr. Kiley noted that there was "no weakness, numbness or paresthesias of lower leg" and "no radiation [of headache], no [history] of migraine . . . no motor or sensory deficits," and the "headache relieves

---

[14] (...continued)
WebMD, https://www.webmd.com/drugs/2/drug-11594-6284/
lovastatin-oral/lovastatin-extended-release-oral/details (last visited Nov. 14, 2018).

[15] Dr. Kiley's medical speciality is not stated in the record.

12

with sleep." (AR 292.) There were "[n]o other medical issue[s]." (Id.) He noted that Plaintiff was in "no acute distress," and he observed no abnormalities. (AR 293.) Specifically, the left-knee exam revealed "no effusion, no erythema, . . . no point tenderness, negative Lachman,[16] normal vagus [sic]/valrus [sic] maneuver."[17] (Id.) It did reveal positive crepitus,[18] but Dr. Kiley observed normal sensation, reflexes, coordination, muscle strength, and tone. (Id.) He removed tramadol from Plaintiff's medication list and added Arthrotec 50[19] "as needed for pain." (AR 294.) He advised Plaintiff to reduce intake of salt, fried foods, and red meat; "choose low fat dairy products"; "start[] or continu[e] a regular exercise program"; and "lose weight." (Id.) Just a couple of weeks later, Plaintiff returned to St. John's, where he saw Dr.

[16] The Lachman test assesses knee instability. See Lachman Test, Physiopedia, https://www.physio-pedia.com/Lachman_Test (last visited Nov. 14, 2018).

[17] The valgus and varus stress tests measure medial and lateral instability in the knee by assessing the tibia in relation to the femur. See Valgus and Varus Stress Test, Physical Therapy Haven, https://www.pthaven.com/page/show/102192-valgus-and-varus-stress-test (last visited Nov. 14, 2018).

[18] Crepitus is a cracking or popping sensation that can affect various parts of the body, especially the knee. See What's to know about crepitus of the knee?, Medical News Today, https://www.medicalnewstoday.com/articles/310547.php (last updated Aug. 30, 2018). Crepitus is usually harmless and doesn't require medical attention unless pain and swelling are present. (Id.)

[19] Arthrotec 50, a brand name for diclofenac sodium, is a nonsteroidal anti-inflammatory used to treat pain, swelling, and joint stiffness from arthritis. See Arthrotec 50, WebMD, https://www.webmd.com/drugs/2/drug-5080/arthrotec-50-oral/details (last visited Nov. 14, 2018).

Jakleen Labbad[20] for "sharp" knee pain, rated as a "6" in intensity. (AR 303.) Plaintiff still reported exercising five times a week, including "walk[ing] and weights." (Id.) The physical exam showed "limited [range of motion]" but "no joint effusion, no erythema." (AR 304.) Dr. Labbad injected lidocaine[21] and Kenalog[22] into the knee joint and noted that Plaintiff "had some relief." (AR 305.) The doctor did not prescribe any new medications but renewed the prescription for Arthrotec 50. (Id.) At Plaintiff's next appointment with Dr. Labbad, the doctor noted that the "[left] knee [was] much better after joint injection, no longer needs cane, using arthrotec rarely." (AR 311.)

In October 2013, just a few weeks before filing for DIB and SSI, Plaintiff stated that he was not in pain (AR 298); exercised five times a week, including "walk[ing] and weights" (id.); and denied "abdominal pain, chest pain . . . headache, [and] musculoskeletal symptoms," among other symptoms (AR 299). The physical exam yielded all normal results, though the doctor noted that Plaintiff was "obese." (AR 300.) At a follow-up visit in November 2013, after he had filed for DIB and SSI, Plaintiff

---

[20] Dr. Labbad's medical speciality is not stated in the record.

[21] Lidocaine is an anesthetic. See lidocaine injection, WebMD, https://www.medicinenet.com/lidocaine-injection/ article.htm#why_is_lidocaine_injection_prescribed_to_patients? (last visited Nov. 14, 2018).

[22] Kenalog is the brand name of triamcinolone acetonide, a corticosteroid hormone that decreases swelling. See Kenalog-40 Vial, WebMD, https://www.webmd.com/drugs/2/drug-9275/ kenalog-injection/details (last visited Nov. 14, 2018).

14

again acknowledged that he was not in pain and "denie[d] any arthritis or joint pain."  (AR 315-16.)

In December 2013, Plaintiff went to St. John's for blood work and medication refill; this time he saw Dr. Janae Vickers.[23] (See generally AR 286-90.)  Dr. Vickers prescribed losartan potassium,[24] metformin,[25] aspirin, hydrochlorothiazide,[26] naproxen,[27] and simvastatin.[28]  (AR 286-87.)  Plaintiff stated that he was not in pain (AR 286); he exercised five times a week, including "walk[ing] and weights" (AR 287); and he had no "chest pain, [shortness of breath], [or] dizziness" (AR 288).  The physical exam revealed no abnormalities, and the diabetes-

---

[23] Dr. Vickers's medical speciality is not stated in the record.

[24] Losartan potassium belongs to a class of drugs called angiotensin receptor blockers, used to treat high blood pressure and protect kidneys from damage from diabetes.  See Losartan Potassium, WebMD, https://www.webmd.com/drugs/2/drug-6616/ losartan-oral/details (last visited Nov. 14, 2018).

[25] Metformin is used with a proper diet and exercise to control high blood sugar.  See Metformin HCL, WebMD, https:// www.webmd.com/drugs/2/drug-11285-7061/metformin-oral/ metformin-oral/details (last visited Nov. 14, 2018).

[26] Hydrochlorothiazide is a diuretic used to treat high blood pressure.  See Hydrochlorothiazide, WebMD, https:// www.webmd.com/drugs/2/drug-5310/hydrochlorothiazide-oral/details (last visited Nov. 14, 2018).

[27] Naproxen is a nonsteroidal anti-inflammatory used to relieve pain from various conditions, including headaches.  See Naproxen, WebMD, https://www.webmd.com/drugs/2/drug-5173-1289/ naproxen-oral/naproxen-oral/details (last visited Nov. 14, 2018).

[28] Simvastatin is used with a proper diet to help manage cholesterol.  See Simvastin, WebMD, https://www.webmd.com/drugs/ 2/drug-6105/simvastatin-oral/details (last visited Nov. 14, 2018).

management exam was normal.  (AR 288.)

From February 2014 through November 2015, Plaintiff went to St. John's numerous times, often reporting that he had no pain. (See, e.g., AR 453-55 (Mar. 2014; also denying "muscle cramps, joint pain, joint swelling, presence of joint fluid, back pain, stiffness, muscle weakness, arthritis, gout, loss of strength, and muscle aches"), 448 and 442 (June 2014), 419 (Nov. 2014),[29] 407 (Mar. 2015),[30] 371 (Oct. 2015),[31] 367 (Nov. 2015).)  When he reported pain or similar symptoms, the examinations almost always yielded normal results.  For example, in February 2014, Plaintiff complained of "numbness on [his left] hand" (AR 319) that had been going on for about a month and "occur[red] almost everyday[] and last[ed] for about five minutes" (AR 321).  A wrist and hand exam yielded all normal results, with no evidence of tenderness. (AR 322.)  And in June 2014, despite reporting "burning feet," a

[29] At one appointment in November 2014, Plaintiff complained of "aching" pain in his lower back at an intensity of "6."  (AR 425.)  Dr. Vickers apparently did not find reason to do any type of testing or prescribe any treatment.  (See AR 427.)  Similarly, when Plaintiff went to St. John's in May 2015 complaining of "aching" in his back at an intensity of "6" (AR 396), Dr. Vickers noted that he was "in no acute distress" and did not prescribe any treatment (see AR 398).

[30] Despite reporting that he was not in pain, Plaintiff did say that his right ankle "g[ave] out on him each am" and "roll[ed]."  (AR 408.)  A diabetes-management exam showed "diminished" sensation in both feet.  (AR 409.)

[31] Plaintiff reported that he was not in pain but also noted that he had "bilateral foot pain, worse in the morning."  (AR 372.)  The physician, Tung Phan, whose specialty is not recorded in the AR, observed that he was not in "acute distress," made no findings with respect to his feet, and told him to do "30 minutes of physical activity 5 times per week."  (See AR 373; see also generally AR 373-76.)

physical examination did not reveal any issues. (AR 449.) In August 2014, Plaintiff's complaints of "arch pain" because of "increased walking" (AR 438) had some limited medical support: the physical exam revealed "flattening of the arch" and indicated possible "fibroma/scar tissue," but the gait analysis showed "overall good alignment and position" (AR 439). The doctor recommended he get over-the-counter shoe inserts and did not refer him for specialist care. (Id.) On a few occasions, the treating physician or nurse referred Plaintiff to a specialist (see, e.g., AR 405), but the majority of the time, the treating provider simply renewed his prescriptions and advised him on proper diet and exercise (see, e.g., AR 370, 382, 410-11).

On September 19, 2014, Plaintiff went to St. John's to have Social Security forms filled out. (AR 436-37.) He apparently reported to the doctor that he had had "sharp feet pain [for] 4 years" (AR 436), but the physical exam yielded all normal results, including "normal full range of motion of all joints," "no focal deficits," and "normal sensation, reflexes, coordination, muscle strength[, and] tone" (AR 436-37). The doctor noted that he was "alert and cooperative," had "normal mood and affect; normal attention span and concentration" (AR 437). He apparently did not fill out the Social Security paperwork.

On October 1 and 2, 2014, Dr. Shom Dasgupta[32] filled out the

---

[32] Dr. Dasgupta's medical speciality is not stated in the record.

Social Security forms for Plaintiff. (See AR 335-40.)[33] The
record does not include treatment notes from any appointments
with Dr. Dasgupta apart from the one on October 2 when he filled
out the forms. (AR 430-34.)[34] The notes from that day indicate
that Plaintiff was not in pain (AR 430) and do not reveal what,
if any, formal testing was performed (AR 430-34). Dr. Dasgupta
recommended Plaintiff do "at least 30 minutes of aerobic exercise
daily" and made some nutritional recommendations. (AR 434.) He
did not order any x-rays, physical therapy, injections, or
surgery, and he did not refer him to any specialists. (See id.)
Nevertheless, Dr. Dasgupta marked that Plaintiff was functionally
limited because of "moderate" pain from "persistent carpal tunnel
syndrome" (AR 336) and could work for only "1 hour" a day because
of "Type II diabetes" and "neuropathy" (AR 337); "extreme" right-
knee pain, including "chronic pain," "limitation of motion,"
"instability," "joint space narrowing," and "inability to
ambulate effectively" (AR 338); and "mild" low-back pain (AR
339). He also reported that Plaintiff suffered from "[m]ild
persistent" asthma but did not note if it caused any functional
limitations. (AR 340.) The notes from the October 2 appointment
show that Plaintiff, for the only time in the record, reported
"[f]eeling down, depressed, or hopeless" for "[s]everal days."
(AR 430.) Based on this apparently one-time expression of
depressed mood, Dr. Dasgupta made a provisional diagnosis of

---

[33] These forms are repeated in the AR from AR 543 to 547.

[34] Dr. Dasgupta apparently referred Plaintiff for a CT scan
of his brain at some point before August 4, 2014, however. (See
AR 551.)

"Mild or Minimal Depressive Symptoms" (AR 431) but did not prescribe any medication or further treatment (see generally AR 431-34).

Various specialists examined Plaintiff or reviewed his records from 2014 to 2016. On June 29, 2015, Plaintiff saw orthopedist Mahmood Jay Jazayeri for his hand and wrist symptoms. (AR 533-34.) The examination "revealed healed scar from previous surgery," "generalized paresthesia," and "questionably positive" Tinel's test.[35] (AR 534.) Dr. Jazayeri noted that the hyperflexion test was "positive at 55 seconds" but that Plaintiff had "full" range of motion and "present and satisfactory" distal pulses. (Id.) The "X-rays obtained . . . from both wrists [were] unremarkable." (Id.) Dr. Jazayeri noted that he needed to "rule out recurrent carpal tunnel syndrome versus diabetic neuropathy." (Id.)[36] He did not prescribe a wrist brace or any sort of treatment. (See id.) On August 1, 2014, Plaintiff had a bilateral knee x-ray, which showed "mild degenerative changes," with "no destructive pathologic process" or "calcification in the soft tissues." (AR 550.) On August 4, 2014, Plaintiff had a CT scan of his brain. (AR 551.) The results were "normal" and showed "no acute intracranial process." (Id.) A specialist

---

[35] Tinel's sign is positive when tapping the front of the wrist produces tingling of the hand. See Carpal Tunnel Syndrome, Medicine Net, https://www.medicinenet.com/carpal_tunnel_syndrome/article.htm (last visited Nov. 14, 2018).

[36] The record doesn't indicate whether a conclusion was reached on this diagnosis. No treatment notes from before this appointment showed a positive Tinel's test, and Dr. Wallack's examination in December 2015 yielded a negative Tinel's. (AR 345.)

19

reviewed his blood work on January 12, 2016, after some questions about whether Plaintiff could have sickle-cell anemia. (See AR 532; see also AR 369, 373-74.) The specialist determined that he had a "benign sickle trait" and noted that there was therefore "nothing to do." (AR 532.) In March 2016, Plaintiff had an endoscopy, after which Dr. Steven Lerner[37] determined that he had "mild" gastritis and prescribed an "anti-reflux regimen," "blood tests," "[o]meprazole,"[38] follow-up care with his primary doctor, and a "colonoscopy." (AR 530.) The record does not show the results of the biopsy. Dr. Lerner performed a colonoscopy the same day, which showed "mild" "[s]cattered diverticula," but the rest of the exam was "unremarkable" and "otherwise normal," with "no abnormalities." (AR 531.) He prescribed a "fiber rich diet" and a repeat exam in "8-10 year[s]." (Id.)

### 2. State-agency consulting-physician records

On December 22, 2015, Plaintiff was examined by consulting internist Michael S. Wallack. (AR 341-47.) Dr. Wallack noted his chief complaints as "[b]ack pain" and "[c]arpal tunnel syndrome." (AR 341.) Plaintiff reported that he had back pain that was "sharp, aching, constant in nature, and primarily in the mid back"; was "given physical therapy as well as some

---

[37] Dr. Lerner's medical speciality is not noted in the record, but he apparently worked at an endoscopy center. (AR 530-31.)

[38] Omeprazole belongs to a class of drugs known as "proton pump inhibitors" and treats certain stomach and esophagus problems, such as acid reflux and ulcers. See Omeprazole, WebMD, https://www.webmd.com/drugs/2/drug-3766-2250/omeprazole-oral/omeprazole-delayed-release-tablet-oral/details (last visited Nov. 14, 2018).

analgesics"; and had had "chiropractic treatments."[39] (Id.) He further reported that he did "not use any cane," was able to "climb stairs," had had "no injections,"[40] was "not aware of any x-rays," and did not use "any type of assistive device" (id.), though he also said he used a "Velcro support . . . at night" (AR 342). He reported that his carpal-tunnel symptoms had recurred and that he had "weakness in his hands, some numbness and tingling, [and] difficulty holding objects." (Id.) Dr. Wallack performed a thorough physical examination and found only that Plaintiff's grip strength was slightly reduced in the left hand (AR 343) though still "good" (AR 345). Plaintiff is right-handed. (AR 343.) All other test results, including of the head, eyes, ears, nose, throat, neck, chest, lungs, heart, abdomen, back, extremities, shoulders, elbows, wrists, hips, knees, and ankles, were normal. (AR 343-45.) Specifically, Dr. Wallack found that with respect to Plaintiff's back, there was "no tenderness to palpation in the midline or paraspinal areas" (AR 344), "straight leg raising test [was] negative at 90 degrees" (id.), and Plaintiff had normal range of motion in all directions (id.). With respect to his wrists and hands, he found "no evidence of tenderness to palpation," "no evidence of Heberden's nodes,"[41] "no Bouchard's nodes,"[42] "normal" range of

---

[39] The record does not show any evidence of physical therapy or chiropractic treatments.

[40] Plaintiff had in fact had one injection in his left knee, on August 29, 2013, which made the knee "much better." (AR 311.)

[41] Heberden's nodes are bony swellings that form on the
(continued...)

21

motion, negative Tinel's sign, and "[n]o reproducible sensory loss." (AR 345.) He determined that Plaintiff's "current symptoms [were] not validate[d] by any objective neurological findings" (id.) and that "[h]is complaints of tingling in his hands and weakness [were] not substantiated on the objective exam" (AR 346). He also found that Plaintiff had "[f]ull range of motion of both knees," "no instability" of the ankles, "[s]trength . . . 5/5 in all extremities," and a "normal" gait. (AR 345.) As for his general observations, he noted that Plaintiff appeared "agile," "got on and off the exam table without any difficulty," and did "not appear to be in any respiratory distress." (AR 343.)

Though Dr. Wallack apparently was not provided any medical records to review (AR 342), he reviewed lab work and considered the results in his report (AR 345). Based on the lab work (see AR 348-49, 356-57), a vision test (see AR 350, 358 (showing nearly perfect vision with glasses; only mildly impaired vision without)), Dr. Wallack's formal testing (see AR 343-45), and his general observations, he assessed no functional limitations apart from "[a]voidance of respiratory irritants given the history of asthma" (AR 346, 352-55).

---

[41] (...continued)
hands, typically the finger joints nearest the fingertips, as a result of osteoarthritis. See What Are Heberden's Nodes?, Healthline, https://www.healthline.com/health/ osteoarthritis/ heberdens-nodes (last updated May 9, 2017).

[42] Bouchard's nodes are similar to Heberden's nodes but occur on the lower joints of the fingers. See What Are Heberden's Nodes?, Healthline, https://www.healthline.com/health/ osteoarthritis/heberdens-nodes (last updated May 9, 2017).

## 3. State-agency reviewing-physician records

In November 2013, a disability-field-office interviewer met with Plaintiff and observed that he was "very cooperative . . . clean and well groomed" but that "his hands looked swollen" and he acted as though his "hand and fingers hurt." (AR 155-56.) The record does not indicate whether this interviewer had any type of medical background.

In March 2014, Plaintiff's medical records were reviewed and evaluated by Dr. E.L. Gilpeer, an internal-medicine specialist.[43] (AR 44-63.) He reviewed records from St. John's as well as a function report, asthma questionnaire, and headache questionnaire. (AR 47-48.) He found insufficient evidence in the file through the date last insured (December 31, 2012) to evaluate the allegations for a DIB claim. (AR 51, 60.) He concluded that Plaintiff had two medically determinable impairments: "severe" sprains and strains and "non severe" diabetes mellitus. (Id.) He noted that these impairments could "reasonably be expected to produce [his] pain and other symptoms," and Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence." (Id.) Dr. Gilpeer found that Plaintiff could occasionally lift or carry "50 pounds" and frequently "25 pounds," could "stand and/or walk" for "[a]bout 6 hours in an 8-hour workday," sit for "[a]bout 6

---

[43] Dr. Gilpeer's electronic signature includes a medical-specialty code of 19, indicating "Internal Medicine." (AR 44); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

hours in an 8-hour workday," and "push and/or pull" for an
"unlimited" time. (AR 52, 61.) He noted no other limitations
and thus concluded that Plaintiff could perform his past relevant
work as a cart pusher, as actually performed. (AR 52-54, 61-63.)
Therefore, he found him not disabled. (AR 54, 63.)

     4.  <u>Plaintiff's statements</u>

In Plaintiff's initial disability report, completed in
November 2013 (<u>see</u> AR 157-63), he reported that he was taking
aspirin "for heart/high blood pressure," lisinopril "for high
blood pressure,"[44] lovastatin "for high blood pressure,"
methocarbamol "for [his] sugar,"[45] and tramadol "for pain" (AR
160). In his function report, dated December 2013, he reported
taking a different set of medications: hydrochlorothiazide,
losartan potassium, naproxen, and Arthotrec. (AR 195.) In his
appeals report dated May 2014, Plaintiff listed yet another set
of medications: tromethamine[46] for "pain and inflammation,"

---

[44] Plaintiff almost certainly was not taking lisinopril in
November 2013. According to treatment notes from October 2013,
he went to the emergency room on September 25, 2013, because of
an anaphylactic reaction to lisinopril, and the medication was
stopped after that. (AR 299.)

[45] Methocarbamol is used to treat muscle spasms and pain and
is usually prescribed along with rest and other treatment. <u>See</u>
<u>Methocarbamol</u>, WebMD, https://www.webmd.com/drugs/2/drug-8677/
methocarbamol-oral/details (last visited Nov. 14, 2018). It
seems Plaintiff was mistaken as to why he was taking this
medication.

[46] Ketorolac tromethamine is used for short-term treatment
of moderate to severe pain in adults, usually before or after
surgery. <u>See</u> <u>Ketorolac Tromethamine</u>, WebMD, https://
www.webmd.com/drugs/2/drug-3919/ketorolac-oral/details (last
(continued...)

hydrochloride[47] for "pain," Robaxin[48] for "muscle pain and spasms," naproxen for "pain and inflammation," Bactrim[49] for "pain and infections," hydrochlorothiazide for "high blood pressure," tramadol for "moderate-to-severe pain," metformin for "diabetes," and gabapentin[50] for "nerve pain and neuropathy." (AR 222-27.) In his appeals report dated June 2014, he listed the following medications: "Ketorolac Tromethamine, Tramadol Hydrochloride, Robaxin, Naproxen, Bactrim DS, Hydrochlorothiazle [sic], Simvastatin, metformin, Losartan." (AR 233.)

In his Headache Questionnaire, dated December 18, 2013, Plaintiff wrote that he began having daily headaches in August 2013. (AR 181.) He classified his headaches as migraines and said they lasted "one or two hours." (Id.) He wrote that he

---

[46] (...continued) visited Nov. 14, 2018).

[47] By hydrochloride, Plaintiff might have meant tramadol HCL, though he also listed tramadol separately. (See AR 233 (referring to "Tramadol Hydrochloride").)

[48] Robaxin is the brand name of methocarbamol, a drug used to treat muscle spasms and pain and usually prescribed along with rest and other treatment. See Robaxin, WebMD, https://www.webmd.com/drugs/2/drug-11197/robaxin-oral/details (last visited Nov. 14, 2018).

[49] Bactrim is a combination of two antibiotics, sulfamethoxazole and trimethoprim, and is used to treat bacterial infections. See Batrim DS, WebMD, https://www.webmd.com/drugs/2/drug-5530/bactrim-ds-oral/details (last visited Nov. 14, 2018).

[50] Gabapentin is used to relieve nerve pain from shingles in adults. See Gabapentin Tablet, Extended Release 24 Hr, WebMD, https://www.webmd.com/drugs/2/drug-14208-1430/gabapentin-oral/gabapentin-sustained-release-oral/details (last visited Nov. 14, 2018).

took "500 mg" of "Naproxen Arthrotec"[51] for the migraines and that they helped "[a] little." (AR 182.) In his Adult Asthma Questionnaire, completed the same day, Plaintiff wrote that he did not know the name of the treating doctor he saw for asthma nor when he last saw him. (AR 199.) He wrote that he had asthma attacks "every now and then" and took "Pro Air HFA"[52] when he needed it. (Id.) He said a doctor prescribed the medication (id.) and that he did not know if he had ever gone to the emergency room or been hospitalized for asthma (AR 200).

In Plaintiff's function report, he wrote that he went outside "daily" (AR 191), prepared food "monthly" (AR 190), watched TV "everyday" (AR 192), and talked on the phone "daily" but didn't go anywhere on a regular basis (id.). He wrote that he could carry "30 pound[s] to the corner" and walk "25 yards" before needing to rest. (AR 193.) He wrote that he used a "cane when walking." (AR 194.) He checked boxes indicating that his impairments affected "[l]ifting," "[s]quatting," "[b]ending," "[s]tanding," "[r]eaching," "[w]alking," "[k]neeling," "[h]earing," "[s]tair-[c]limbing," "[m]emory," "[c]ompleting [t]asks," "[c]oncentration," and "[u]sing [h]ands." (AR 193.)

Plaintiff testified in April 2016 that he cooked "every now

---

[51] These are two different drugs, neither of which generally treats migraines. The record does not convey whether Plaintiff took these medications together or separately.

[52] Proair HFA, a brand name of albuterol sulfate, is used to prevent and treat wheezing and shortness of breath caused by such breathing problems as asthma. See Proair HFA Aerosol with Adapter, WebMD, https://www.webmd.com/drugs/2/drug-144702/proair-hfa-inhalation/details (last visited Nov. 14, 2018).

and then," read, watched TV, and had "had a dog." (AR 38.) He gave up the dog not because of his health issues but rather because another tenant did not like them. (AR 38-39.) He went to church "[e]very Sunday" and had fished until "two years ago" (which, at the time of the hearing, referred to 2014, well after the alleged onset date). (AR 39.) He testified that he did not do his own grocery shopping (AR 38), though he had written in his function report that he went grocery shopping "monthly but not [for] long" for "food [for] daily needs" (AR 191). He also wrote that he did not drive. (See id.) In his May 2014 appeal, however, he wrote that he "[could] not walk nor drive long distances," implying that he could drive at least short distances (AR 228), and he testified in April 2016 that he drove "every now and then" (AR 38). And in December 2015, Plaintiff reported to consulting physician Wallack that he drove and cooked. (AR 342.)

C. Analysis

Plaintiff argues that the ALJ improperly discounted his testimony regarding pain, symptoms, and limitations because he "fail[ed] to indicate how the impairments in combination or individually [were] not expected to cause his symptoms." (J. Stip. at 7.) He also argues that the ALJ erred by discounting Plaintiff's statements because Plaintiff attributed his alleged inability to work in part to his age (id. at 7-8),[53] failing to

_____

[53] This argument is without merit. As the ALJ correctly noted, "[a]ge is not a factor considered when considering a residual functional capacity." (AR 17.) Age is considered at the fifth step, which is reached only if an ALJ determines that a

(continued...)

identify the inconsistencies he relied on to discount the statements' credibility (id. at 9), using the wrong standard to assess the objective medical evidence (id.), and failing to identify which testimony he found "unsupported and why" (id.). In fact, the ALJ provided numerous clear and convincing reasons for rejecting Plaintiff's testimony.

       1.   <u>Inconsistencies with objective medical evidence</u>

The ALJ properly discounted some of Plaintiff's statements by considering and identifying numerous inconsistencies concerning them. (<u>See</u> AR 16-20.) Contradiction with evidence in the medical record is a "sufficient basis" for rejecting a claimant's subjective symptom testimony. <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1161 (9th Cir. 2008); <u>see also Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining credibility). Although a lack of medical evidence "cannot form the sole basis for discounting [symptom] testimony, it is a factor that the ALJ can consider in his credibility analysis." <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005); <u>Rollins v.</u>

_____

[53] (...continued)
claimant cannot perform any past relevant work. §§ 404.1520(f), 416.920(f). Here, the ALJ found, and Plaintiff does not directly contest, that Plaintiff had the RFC to perform his past relevant work as a cart pusher, or stores laborer, as generally performed. (AR 20-21.) Thus, there was no need to assess whether Plaintiff could perform other jobs in the economy and no need to consider his age.

Massanari, 261 F.3d 853, 857 (9th Cir. 2001). Plaintiff argues that the ALJ merely "summarize[d] medical evidence" (J. Stip. at 9 (citing Brown-Hunter, 806 F.3d at 494)), but in fact he systematically identified each of Plaintiff's alleged impairments and compared his subjective symptom testimony with the objective medical evidence, noting the differences. (See AR 16-20.) Unlike the ALJ in Brown-Hunter, the ALJ here "specifically identif[ied] the testimony [he] found not credible" and "link[ed] that testimony to the particular parts of the record supporting [his] non-credibility determination." 806 F.3d at 494.

Plaintiff claimed that he could not work because of "carpal tunnel on both hands, diabetes, ACL on right knee, asthma, arthritis on left knee, cataract, high blood pressure, headaches, and back pains." (AR 46, 158.) The ALJ found that Plaintiff's "musculoskeletal sprains and strains and mild degenerative changes of the bilateral knees" were severe impairments. (AR 12.) He found the rest of the alleged impairments "medically determinable" but "non-severe" (id.), a finding Plaintiff has not challenged on appeal.

As the ALJ noted, "most of the limited evidence suggests that [Plaintiff did] not have recurrent carpal tunnel syndrome and the only objective clinical evidence of carpal tunnel syndrome [was] questionable." (AR 13.) The ALJ went through the medical evidence pertaining to Plaintiff's wrists, including examinations done by the treating physicians at St. John's, consulting physician Wallack, and the carpal-tunnel specialist. (Id.) He specifically cited Dr. Vickers's findings that

29

Plaintiff's wrists and hands were "[n]on tender to palpation bilaterally" and "negative" for Tinel's (AR 13 (citing AR 322)); Dr. Wallack's findings of no tenderness, no Heberden's nodes, no Bouchard's nodes, no deformities, no sensory loss, and normal range of motion (AR 13 (citing AR 341-346)); and Dr. Jazayeri's findings of "full range of motion," "satisfactory distal pulses," and "unremarkable" x-rays (AR 13 (citing AR 534)). Although Dr. Jazayeri found generalized paresthesia, a questionably positive Tinel's test, and a positive hyperflexion test, the doctor wasn't certain if the issues were the result of carpal tunnel or something else. (Id.) Moreover, as the ALJ observed, the record does not show "any significant treatment for this condition." (AR 13.)

Plaintiff's diabetes did not appear to cause "significant limitations." (Id.) His diabetes-management exams were almost entirely normal during the relevant period (see, e.g., AR 288, 537, 539), with only one exam, in March 2015, showing "diminished" sensation (AR 409). Similarly, Plaintiff's vision tests were all unremarkable, and cataracts were not mentioned in either of the eye examinations included in the record, as the ALJ noted. (See AR 350 (Dec. 2015 visual-acuity test results noting "20/20" vision with glasses), 535 (Jan. 2015 retinal-imaging report noting "no apparent diabetic retinopathy" in either eye); see also AR 15 (ALJ noting "no diagnosis of cataracts from an acceptable medical source").) Plaintiff's high blood pressure was managed with medication and dietary guidance (see generally AR 251-340, 361-525), and so found not to be severe or the cause

of "any significant limitations" (AR 14).

As for Plaintiff's complaints of headaches, the objective medical evidence in the record does not substantially support them. As the ALJ noted, he did not "consistently complain of headaches" and "did not receive significant treatment" for them. (AR 14.) The CT scan of his brain revealed no abnormalities (AR 551), and he was never prescribed migraine-specific medication (see generally AR 251-340, 361-525). His back-pain complaints are similarly uncorroborated by the record. (See AR 396-98, 425-27 (physician found no objective medical evidence to support Plaintiff's complaints). But see AR 284 (physician found spinal tenderness at L5-S1).) Despite Plaintiff's complaining of back pain a few times, no physician ever prescribed an x-ray, physical therapy, hot or cold treatment, or even stretches (see generally AR 251-340, 361-525), as the ALJ noted (AR 18). Plaintiff's asthma also appeared to be insignificant. His own notes on the Asthma Questionnaire indicate that it was not treated regularly and did not need to be. (AR 197-201; see also AR 14 (ALJ noting Plaintiff's "inconsistent" statements concerning his asthma and use of inhaler).) And as the ALJ noted, not a single examination revealed arthritis in either knee, and the record lacks objective support for any current issues with Plaintiff's ACL. (See AR 304, 312, 444 (noting "[p]ast [s]urgical [h]istory"); see also AR 550 (noting that x-ray revealed right knee to be "[p]ost-surgical status"), 15 (ALJ noting that "tear occurred sometime in the 1980s" and "[t]he records do not show any significant treatment or complaints concerning this impairment since then").)

31

The ALJ noted that "sick[le] cell thalassemia disease, anemia, plantar fascial fibromatosis, and gastritis" were also medically determinable impairments but nonsevere because they did not create a "significant limitation . . . to do basic work activities . . . and/or have not lasted or are not expected to last . . . for a continuous period of 12 months."  (AR 12-13.) Plaintiff, through his testimony (see AR 35-38) and in the Joint Stipulation (see J. Stip. at 7), seems to argue that these impairments, in combination with the others, could reasonably cause some degree of his symptoms.  But Plaintiff has not challenged the ALJ's step-two findings or argued that any of these impairments lasted for a continuous 12-month period.  The medical record, moreover, simply does not show that they had much or any impact on his functionality.  In fact, Plaintiff apparently does not even have some of them.  Although he testified that he was diagnosed with sickle-cell anemia (AR 36), the record shows (and the ALJ noted (AR 14)) that he had a "benign" trait, not the actual disorder (AR 532).  Also, although a physician found possible evidence of "fibro/scar tissue," he noted that the extensors and flexors were "firing [within normal limits]" and gait analysis showed "[o]verall good alignment and position."  (AR 439.)  The physician recommended getting over-the-counter shoe inserts and did not prescribe any follow-up treatment.  (Id.)  A doctor indicated that Plaintiff should take antireflux medication for gastritis, but as the ALJ correctly assessed, "the record does not indicate significant complaints" and "it [was] unclear whether this condition [would] last for the

requisite 12 months." (AR 15, <u>see also</u> AR 529-30 (endoscopy results noting "mild" gastritis).)

As for the "severe impairments," the ALJ found that even in combination with all the other medically determinable impairments, they could not have reasonably produced Plaintiff's pain symptoms as he testified to them. (AR 17.) This assessment is justified. Plaintiff's records from St. John's, spanning 2012 to 2016 (<u>see</u> AR 251-340, 361-525, 537-49, 553-54), which the ALJ cited to extensively (<u>see</u> AR 13-19), show routine care, with no complications and almost no abnormal or remarkable findings. Indeed, Plaintiff often reported that he had no pain. (<u>See, e.g.,</u> AR 286, 298, 315-16, 367, 371, 407, 419, 442, 448, 453-55, 448.) Numerous doctors and nurse practitioners treated Plaintiff during the relevant period, and the vast majority of their physical examinations had entirely normal results. (<u>See</u> AR 283, 293, 300, 308, 316, 322, 369, 373, 380, 393, 403-04, 409, 415, 420, 436, 445, 449, 456 (all showing normal results).)

Consulting physician Wallack also found entirely normal results after performing a series of diagnostic tests. (<u>See</u> AR 341-46.) He found no functional limitations apart from a restriction on being near respiratory irritants. (<u>See</u> AR 346.) The ALJ gave this opinion "some weight." (AR 19.)

One physician from St. John's (who, as the ALJ noted, is not identifiable from the record (<u>see id.</u>)) assessed somewhat more restrictive limitations, but the record doesn't indicate if this physician examined Plaintiff more than once or what if any diagnostic tests were done to assess the restrictions. (<u>See</u> AR

33

325-31.) The physician noted that Plaintiff hadn't been "x-rayed for many years" (AR 327) and that she "need[ed] documentation" to support her "brief diagnosis" of "stiff [left] knee" (AR 330). She further indicated that he had no "severe" condition (AR 328), should not apply for SSI (AR 329), and was "employable with accommodations" (AR 330). The ALJ gave this opinion "little weight" given the lack of clarity about "what kind of treatment relationship this physician ha[d] had with the [Plaintiff]," what her speciality was, the lack of "diagnostic evidence," and the inconsistencies with treatment records from around the same time. (AR 19.)

Dr. Dasgupta assessed the most stringent restrictions (AR 336-41), but the ALJ gave his opinion "little weight" (AR 19) because it was "unclear what kind of treatment relationship" he had with Plaintiff and the doctor "provided limited explanation" (AR 20). Plaintiff appeared to have seen Dr. Dasgupta only once, the day he rendered his opinion. (See AR 430-34. But see AR 551.) His treatment notes for that day are inconsistent with his opinion. For example, he opined that Plaintiff had an "inability to ambulate effectively" and was "functionally limited" to only one hour of work a day (AR 338), but his treatment notes recommended that he do "at least 30 minutes of aerobic exercise daily" (AR 434). And despite the severe restrictions he assessed (see generally AR 336-41), he did not order any x-rays, physical therapy, injections, or surgery, and he did not refer him to any specialists (AR 434). Also, as the ALJ noted, his assessment appeared to "rely heavily on [Plaintiff's] subjective

34

complaints." (AR 20.) Indeed, the record does not indicate what tests, if any, were performed to assess the severe restrictions (see AR 336-41, 430-34), and the severity of the restrictions was not supported by the record as a whole.

The ALJ gave "significant weight" to the opinions of the state-agency medical reviewers, which were "not inconsistent" with the consulting physician. (AR 18.) He noted that they were "experts" and reviewed at least "some of the records in evidence," and the later evidence "[did] not support more restrictive limitations." (AR 18-19.)

Plaintiff has not challenged the ALJ's assessment of any of the opinion evidence on appeal. For all these reasons, substantial evidence supported his conclusion that Plaintiff's "statements [were] not fully corroborated with the evidence in the record" and his "treatment records [did] not substantiate [his] complaints." (AR 17.) See Rounds, 807 F.3d at 1006.

2. Activities of daily living

The ALJ also discounted Plaintiff's subjective symptom testimony because his activities of daily living were inconsistent with the alleged degree of his symptoms, and his reports of daily activities were themselves inconsistent. (AR 17-18.) An ALJ may discount a claimant's subjective symptom testimony when it is inconsistent with his daily activities. See Molina, 674 F.3d at 1113. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id.

Throughout the record, as the ALJ noted (AR 18), Plaintiff reported regular exercise (see, e.g., AR 282, 287, 291, 298, 303, 307, 311, 321, 443, 448, 454 (reporting exercising five to seven times weekly, with regimen of walking and weights); see also AR 368, 372, 380, 393, 397, 403, 408, 414-15, 420, 423, 426, 431, 435 (reporting exercising once weekly by walking)).  Dr. Dasgupta encouraged him to do "at least 30 minutes of aerobic exercise daily" (AR 434), and another physician recommended he exercise five times a week for 30 minutes at a time (AR 370).  Plaintiff contends that the ALJ erred by rejecting his testimony on account of his exercise (see J. Stip. at 11) because the "nature and extent" of the exercise is "not in the record" (id.), relying on Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017), for support.  But unlike in Trevizo, the record here has plenty of information to support a specific conflict with Plaintiff's reported limitations, as doctors found him capable of regular 30-minute exercise periods.  (See, e.g., AR 370, 434.)  This conflicted with his testimony that he could walk only 100 feet before needing to rest, among other such claims.  (AR 36.)

In Plaintiff's function report, he marked that he had "[n]o problem" caring for himself (AR 189) and prepared food on a monthly basis (AR 190).  By his own account, he could capably handle his own finances.  (AR 191.)  He testified that he cooked "every now and then" (AR 38), read, watched TV, and had "had a dog" that he cared for (AR 38-39).  He apparently gave up the dog only because another tenant did not like them.  (Id.)  He also testified that he went to church "every Sunday."  (AR 39.)  As

36

late as 2014 he was still fishing. (Id.) These statements were inconsistent with Plaintiff's professed limitations. (See, e.g., AR 191-93 (writing in his function report that he didn't go anywhere regularly and couldn't finish tasks)); see also Sharp v. Colvin, No. 1:13-cv-02028-BAM, 2015 WL 1274727, at *5 (E.D. Cal. Mar. 19, 2015) (finding that ALJ properly discounted plaintiff's testimony as inconsistent with daily activities when, among other things, he cooked occasionally, went grocery shopping with his mother, cared for his dog, and walked around block).

The ALJ noted that Plaintiff inconsistently reported his ability to grocery shop. (See AR 17 (referring to Plaintiff's testimony at AR 38 (that he did not do his own grocery shopping), 191 (reporting that he went grocery shopping "monthly but not for long" for "food [for] daily needs").) Plaintiff also inconsistently reported and testified about driving. (See AR 191 (reporting that he did not drive), 228 (reporting that he "cannot walk or drive long distances"), 38 (testifying that he drove "every now and then"), 342 (reporting that he drove and cooked at home).)

Therefore, the ALJ appropriately considered the contradictions between Plaintiff's daily activities and his subjective symptom testimony and identified various inconsistencies in Plaintiff's reports about those daily activities. See Rounds, 807 F.3d at 1006.

### 3. Conservative treatment

The ALJ also discredited some of Plaintiff's statements because his "treatment correspond[ed] with the limited objective

findings." (AR 18.) Conservative treatment is a clear and convincing reason to reject a claimant's subjective symptom testimony. <u>Parra</u>, 481 F.3d at 751.

The ALJ noted that with respect to Plaintiff's complaints of back pain, his physicians had not sent him for "X-rays or MRIs" or given him "any spinal injections." (AR 18.) He further noted that the single x-ray in the record, of Plaintiff's knees, showed "only mild degenerative changes." (<u>Id.</u> (citing AR 550).) Plaintiff was not prescribed "physical therapy," "a TENs unit," or any other "conservative measures such as massage therapy, acupuncture, or aqua therapy." (AR 18.) <u>See</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039-40 ("physical therapy and the use of anti-inflammatory medication, a [TENS] unit, and a lumbosacral corset" qualified as conservative treatment); <u>Walter v. Astrue</u>, No. EDCV 09-1569-AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (narcotic medication, physical therapy, and single injection amounted to "conservative treatment"). Plaintiff was not told to do any at-home treatments, including stretches or hot or cold packs. (<u>See</u> AR 13.) A doctor only once found Plaintiff to be in need of an injection, to ease knee pain, and it relieved his pain. (<u>See</u> AR 305; <u>see also</u> AR 311.) Apart from tramadol, which Plaintiff took only until August 2013 (<u>see</u> AR 294), he simply took nonnarcotic medications to relieve his symptoms (AR 18). <u>See</u> <u>Huizar v. Comm'r of Soc. Sec.</u>, 428 F. App'x 678, 680 (9th Cir. 2011) (ALJ permissibly discounted claimant's testimony because her "physical and mental impairments responded favorably to conservative treatment," which included "use of

38

narcotic/opiate pain medications" (emphasis omitted)); <u>Warre v. Comm'r of Soc. Sec. Admin.</u>, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.")

As the ALJ remarked, despite Plaintiff's testimony of a "daily pain level of 8, his treatment providers did not provide treatment regimens that would indicate [he] was frequently complaining of severe pain." (AR 18.) Indeed, much of the time he told his doctors he had no pain. (<u>See, e.g.</u>, AR 286, 298, 315-16, 367, 371, 407, 419, 442, 448, 453-55.) The majority of the time, the doctors simply renewed his prescriptions and advised him on proper diet and exercise (<u>see, e.g.</u>, AR 370, 382, 410-11). Thus, the ALJ properly discounted Plaintiff's allegations of disabling pain because his impairments were treated conservatively.

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[54] IT IS ORDERED that judgment be entered

---

[54] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: November 14, 2018

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge